**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SYNTEX (USA) LLC, and ALLERGAN, INC., | No. C 01-02214 MJJ |
| Plaintiffs, | Related Case:<br>No. C 05-02116 MJJ |
| v. | **ORDER GRANTING TEMPORARY RESTRAINING ORDER** |
| APOTEX INC, APOTEX CORP., and NOVEX PHARMA, | |
| Defendants. | |

Pending before the Court is Plaintiffs Syntex (USA) LLC, and Allergan, Inc.'s Ex Parte Motion for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction (Doc. #487). On December 29, 2005, the Court entered a Temporary Restraining Order enjoining Defendants from commercially manufacturing, using, offering to sell, selling or importing into the United States any drug product the approval for which is sought through Abbreviated New Drug Application 76-109, pending this Court's decision as to whether a preliminary injunction should issue. Subsequently, on February 23, 2006, the Court entered an Order extending the TRO until the Court ruled on Plaintiffs' request for a preliminary injunction and Defendants' related obviousness challenge to Plaintiffs' '493 patent. Construing the extension of the TRO as a preliminary injunction, on May 1, 2006, the Federal Circuit issued an order vacating this Court's Order extending the TRO for lack of factual findings necessary to support a preliminary injunction under Federal Rule of Civil Procedure 52(a). (Doc. #487, ex. A..) In light of the Federal Circuit's ruling, and for the reasons articulated below, the Court **GRANTS** Plaintiffs' Motion as provided in this Order.

I.  Legal Standard

In ruling on a motion for a temporary restraining order, the Court evaluates the following factors: (1) the probability that the movant will succeed on the merits; (2) the threat of irreparable harm to the movant should a preliminary injunction be denied; (3) the balance between this harm and the harm that granting the injunction will cause to the other parties; and (4) the public interest. *Anton/Bauer, Inc. v. PAG, Ltd.*, 329 F.3d 1343, 1348 (Fed. Cir. 2003).

II.  Discussion

    A.  Likelihood of Success on the Merits

Defendants attack the validity of the '493 patent on the ground that it is obvious. Thus, the Court must assess Plaintiffs' request for injunctive relief in the context of Defendants' obviousness challenge. Section 103(a) of the Patent Act states that "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." *See KAO Corp. v. Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006). Obviousness is a legal determination based on factual determinations, including: what a prior art reference teaches; whether a reference provides a motivation to combine its teachings with others; whether the invention experienced commercial success; and whether it satisfied a long-felt, but unmet need. *Tec Air, Inc. v. Denso Mfg. Mich., Inc.*, 192 F.3d 1353, 1359 (Fed. Cir. 1999). Assessing the factual questions, the Court finds that Plaintiffs have sufficiently demonstrated a likelihood of success on the merits in defending against Defendants' obviousness attack.

First, the Court finds that Plaintiffs have presented persuasive evidence that none of the prior art references suggest a motivation to combine to form the patented invention. The Waterbury, Gilbert, and Han patents do not discuss long-term stability or anti-microbial effectiveness and do not address any problems relating to the interaction of BAC and ketorolac tromethamine. (R.T. 1158:1-6, 1159:25-1160:3; 1707:25-1710:6; Trial Ex. WJ; Trial Ex. AK.) With respect to *McCutcheon's*, while it identifies Octoxynol 40 as an "emulsifier, stabilizer," it does not disclose the use of Octoxynol 40 in a pharmaceutical. (Trial Ex. AL.) Further, there is no evidence that anything in *McCutcheon's* suggests that Octoxynol 40 could be used on a pharmaceutical product or in an ophthalmic formulation, or that

2

it would preserve the anti-microbial effectiveness of a preservative. (*Id.*) Further, none of the prior art references disclose a functional equivalence between Octoxynol 40 and any of the surfactants disclosed in the prior art references.

Second, Plaintiffs have presented sufficient evidence to rebut Defendants' argument that a motivation to combine existed. In support of their argument that there was a motivation to substitute Octoxynol 40 for the surfactants disclosed in the Waterbury, Gilbert, and Han patents, Defendants primarily rely on Dr. Mitra's testimony that Octoxynol 40 was well-known in the cosmetic industry and that it would be easy to substitute an octoxynol like Octoxynol 40 for another non-ionic surfactant such as Polysorbate 80. (Record Transcript 1143-1144.) Notably, Dr. Mitra never opined that it would have been obvious to one skilled in the art at the time Plaintiffs' applied for their patent to use a non-ionic surfactant as a stabilizer in an ophthalmic formulation containing an NSAID. (*Id.*) Additionally, Defendants cite Dr. Mitra's testimony that all water-soluble non-ionic surfactants would have worked equally well in the patented formulations. Plaintiffs, however, have presented testimony from their expert, Dr. Stella, calling into question the validity of Dr. Mitra's theory regarding the substitutabiliy of surfactants. (R.T. 1717.) Particularly, Dr. Stella criticized Dr. Mitra's theory on the basis that it failed to take into account structural variations among surfactants and the effect of other variations, such as differences in BAC and environmental factors. (*Id.*) At a minimum, Dr. Stella's testimony undermines Dr. Mitra's testimony and Defendants' ability to meet its burden of demonstrating a motivation to combine.

Third, Plaintiffs have presented evidence that ACULAR®, the commercial embodiment of the patented invention, supports a finding of non-obviousness. Particularly, in its first year in the market, ACULAR®'s net sales exceeded $18 million, and have steadily increased since that time. (R.T. 1541:13-1555:14; 1558:23-1562:18; Trial Exs. 090, 091.) Moreover, ACULAR®'s sales have exceeded other competitor drugs, including Voltaren Ophthalmic®, which like ACULAR® is an ophthalmic NSAID, but does not contain ketorolac tromethamine or Octoxynol 40. (Trial Exs. 091, 092, 095, 096; R.T. 1561:20-1562:18, 1577:8-14.) Thus, this evidence also ways in favor of a finding that ACULAR® satisfied an unmet need in the market.

Additionally, Plaintiffs have put forth persuasive evidence that the patented inventions produced

3

1 unexpected results, even when viewed in light of the criticisms of the first patent examiner and the
2 prosecution history. As Plaintiffs highlight, data in the prosecution history shows that Octoxynol 40
3 outperformed both Polysorbate 80 and Myrj 52. (R.T. 695:1-701:14; Trial Exs. 204, 205.)

4     Taken together, the foregoing evidence creates a strong likelihood that Plaintiffs will succeed
5 in defending against Defendants' obviousness challenge to the '493 patent. Thus, this factor weighs in
6 Plaintiffs' favor.

7     B.     Threat of Irreparable Harm

8     Next, the Court must assess whether Plaintiffs will suffer severe and irreparable harm absent
9 injunctive relief. Plaintiffs have previously submitted compelling evidence that: (1) the release of a
10 generic equivalent to Plaintiffs' product would be devastating to Allergan's commercial goodwill and
11 competitive position in the ophthalmic anti-inflammatory market; (2) the damage to Allergan's goodwill
12 and pricing structure could not be repaired if Defendants' product was pulled off the market following
13 final judgment for Plaintiffs in this matter; and (3) Allergan's goodwill would be further harmed by its
14 causing a recall of a generic product a short time after its general release. *See* Doc. #431, Decl. of Julian
15 Gongolli at ¶¶ 3-4. Further, this harm is not remediable by monetary damages and Plaintiffs have no
16 other adequate remedy at law.

17     C.     Balance of Plaintiffs' Harm and the Harm Caused by Granting the Injunction

18     The balance of hardships tips in Plaintiffs' favor because, should Plaintiffs prevail in upholding
19 the validity of their patent, denying injunctive relief at this stage will subject Plaintiffs to the irreparable
20 harm detailed above, whereas Defendants will remain in the same position.

21     D.     Public Interest

22     Finally, the public interest strongly favors enforcement and protection of patent rights.
23 Defendants' temporary loss of market share pending the Court's ruling on the issue of obviousness, is
24 insufficient to overcome Plaintiffs' right to enforce their patent until and unless it is invalidated. *See*
25 *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1382 (Fed. Cir. 2005).

26 III.     Conclusion

27     Based on the foregoing analysis, the Court finds that Plaintiffs have make the requisite showing
28 entitling them to temporary injunctive relief. The Court therefore **GRANTS** Plaintiffs' Ex Parte Motion

4

for Temporary Restraining Order as follows:

Defendants Apotex, Inc. Apotex Corp., and Nova Pharma, along with the representatives, officers, agents, servants, employees, and attorneys, and any persons acting in concert or participation with them, are restrained and enjoined, pending this Court's decision as to whether a preliminary injunction should issue and concurrent resolution of Defendants' obviousness challenge to the '493 patent,[1] from commercially manufacturing, using, offering to sell, or selling within the United States or importing into the United States any drug product the approval for which is sought through Abbreviated New Drug Application 76-109.

In light of the short time the temporary injunctive relief will be in place and based on the parties' previous calculations of the amount of damages that would be directly attributable to the injunction, the Court finds that a $500,000 bond is appropriate. Accordingly, the Court orders Plaintiffs to post a $500,000 bond with the Clerk of the Court during the pendency of the TRO.

**IT IS SO ORDERED.**

Dated: 5/18/2006

MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

---

[1] The Court anticipates that it will issue its ruling by the expiration of this TRO.

5